Gaston, Judge,
 

 after stating the case, proceeded : — We have felt some difficulty in the consideration of this cause, on a point which was not discussed nor raised upon the argument. It is, of course, the duty of Courts to carry out into full execution the legislative will, so far as they can collect it. In the act by which the proceedings in this case profess to be regulated, it is declared with sufficient plainness,' that persons who are interested in the various office-bonds which ¡ re taken 1 y th ! Court, and who deem themselves injured by a breach of their conditions, may institute suits in their own name in the form of a petition; that the defendants shall answer to the petitions upon oath; and that finally the Court shall decree such remedy thereon as the nature of the case shall require and the ends of justice may demand. In these respects the method of proceeding seems analogous to that which
 
 *419
 
 obtains in our equity jurisprudence. Rut the act also provides, that parol evidence shall be heard, and that' “ the process” shall be in a
 
 summary
 
 way. We have doubted whether
 
 these
 
 provisions do not indicate a reference to the common law mode of proceeding. At law, all the allegations of a plaintiff, not answered by the defendant’s plea, are confessed. In equity, the charges not admitted by the answer, are put m issue. Are we to consider the fact, alleged in the petition, of the execution of the guardian-bond by the defendants, confessed or denied ? If the practice at law is to prevail, unquestionably, its execution has not been denied. There is no averment, that the allegation of the petitioners is in this respect untrue. The execution of the bond has not been . . . .
 
 .
 
 put in issue, the verdict of the jury is irrelevant, and the petitioners have a right to proceed with their case, notwithstanding that verdict. If the equity practice should obtain, the defendant’s answer as to the execution of the bond was manifestly insufficient. He was bound to answer, not only as to his knowledge, but also as to his information and belief. He had no right in conscience to require, that the petitioners should be put to strict proof, or to any proof of an allegation which he believed to be true. If, indeed, he was not only personally ignorant of the matter charged, but had no information to warrant him in forming a belief in respect to it, he might properly have so answered, and then have required that the petitioners should be put to proof thereof. But the regular course, where an answer is evasive or insufficient, is to except to the answer, and compel a full and direct one. Unless this be done, the plaintiff is under the necessity of proving every material averment in his bill which has not been admitted by the defendant, although the same amount of proof is not required, as is indispensable when the averment has been denied. The legislative intention on this point is not clearly seen; but we think it reasonable to infer, and therefore we do so decide, that as the defendant was compelled to make his defence in the form prescribed by the usages of equity, the effect of that defence should be such as by those usages belongs to it, and the trial of the matters put in issue therein should conform thereto.
 

 
 *420
 
 It was then competent for the Court below to order an issue to ascertain the truth of any matters charged, upon which the conscience of the Court required to be informed. We disapprove of the terms in which the issue submitted to the jury was expressed, if those terms be designed (as from the charge of the Judge it appears they were,) to restrict inquiry to a bond
 
 •precisely
 
 corresponding with that described in the petition. According to the most rigorous course of equity practice, no more is necessary to be proved of the matter charged, than what makes out the plaintiff’s claim to relief. All the light which the conscience of the Court needed on this part of the matter in controversy, was information whether the defendant’s intestate had executed a bond for the petitioner Mary, as surety for her guardian; and if so, then to what amount the penalty extended. If he had, the claim of the petitioners was precisely the same, whatever might be the names of the justices to whom it was formally made payable. Nor was the exact amount of the penalty material. It was important only to know what sum was certainly covered by it, for that
 
 beyond
 
 that sum, liability for the guardian’s misconduct did not attach to the defendant’s intestate. As the issues in equity are made up by the Court itself for the satisfaction of the Court, and to be tried before the Court itself, that in question should have been so modified, or the jury so instructed upon it as to enable them to find the truth of what was material only, and not defeat the great purpose of the inquiry, by confining their attention to what was formal and unessential. Perhaps the issue as
 
 expressed,
 
 did not warrant the part of the charge excepted to, and the relief of the petitioners on account of the injury in this respect sustained, might be to reverse the decree of dismission, and send the cause back for further inquiry, whether
 
 any
 
 guardian-bond, and if any,
 
 what
 
 bond given by William E. Daughtry, as guardian for the petitioner Mary, was executed by the defendant’s intestate. But it is unnecessary to decide this matter distinctly, as for other reasons an
 
 alias venire
 
 must be ordered.
 

 The finding on the issue is conclusive of the particular fact so found, unless the petitioners have just matter of
 
 *421
 
 exception, because of the evidence offered and rejected. The issue, though single, embraced several matters of inquiry. That the guardian-bond, if it ever existed, had been destroyed, was not a matter to be controverted, for that was declared by the act of the legislature, and a statute is conclusive as to all public facts which it recites.
 
 Rex
 
 v.
 
 Sutton,
 
 4 Mau. & Selw. 553. But it was to be inquired, first, whether such a bond had ever been given ; secondly, if given, whether the defendant’s intestate was one of the obligors; and finally, what were the contracts or terms of the bond. The appointment of Daughtry as guardian, was admitted in the pleadings, and upon that appointment, a legal presumption arose that he executed a guardian-bond, since such a bond is made a pre-requisite to the appointment. The next inquiry in order, was, whether the defendant’s intestate was a party to the bond. The testimony offered on this part of the controversy, was received by the Judge, and submitted to the jury; but it has here been insisted in argument, that it was so slight, as not to amount to the character of
 
 evidence,
 
 and to lay no foundation for proving the contents of the bond. We are of opinion, not only that there was evidence of the execution of the bond by the intestate, proper to be submitted to the jury, but evidence, which if believed and not contradicted nor explained away, warranted the finding of the fact. The instrument in question was not a private unauthenticated paper belonging to the petitioners, which had been lost by them, or by those to whom they had intrusted its custody; it was a bond taken under the act for the better care of orphans, and security and management of their estates. By that act, authority is given to the Courts to take cognizance of the estates of orphans, and to appoint guardians to them where it shall be necessary. The Justices holding such Courts, are required to take good security of all guardians by them to be appointed, under the penalty of being themselves responsible for all damages sustained by the orphan, for the want of such security. It is further directed that the bond shall be made payable to the justices present in Court, granting such guardianship, the survivors or survivor of them, their executors or admin
 
 *422
 
 istrators, for the benefit of the orphan, and that the bond shall be acknowledged in Court, and caused to be recorded. The instrument which was the subject of inquiry, was an obligation of this character, taken by a court in the exercise of a most important power over the estate of an individual incompetent to give consent; acknowledged in Court; ordered to be recorded as a perpetual memorial of the engagement therein contained, and deposited among the records and documents of the Court. It is not in its form a recognizance. It is so like it, however, in substance, that perhaps it would have been doubtful what was the appropriate remedy to be pursued upon it, had not the same act plainly indicated it. The act goes on to provide that in the name of the justices to whom it is made payable, the survivor or survivors of them, their executors or administrators, any person injured, may and shall at his costs and charges, commence and prosecute a suit against such guardian, and his securities, executors or administrators, and shall and may recover all damages which he has sustained by the breach of the condition. It still, therefore, retains its legal character of a bond; is to be sued on as a bond, and is open to the legal defences which may be made against it as such. When a suit is brought, its execution may be denied by plea, for it does not import
 
 absolute verity.
 
 But it is yet a document partaking of a public nature, taken by public authority, having a high character of authenticity, and it requires not that it should be verified by the ordinary tests of truth, applied to merely private instruments, the obligation of an oath and the power of cross-examining witnesses, on whose veracity the truth of such instruments depends. Confidence is due to it, because of the authority of the Court by whom it was taken, and whom the state, in discharge of the parental duties which it owes to orphans, has empowered to take it. “ Where particular facts are inquired into, and ordered to be recorded for the benefit of the public, those who are empowered to act in making such investigations and memorials, are in fact, the agents of all the individuals who compose the public, and every member of the community may be supposed privy to the investigation.” Stark. Evi.
 
 *423
 
 195.
 
 Prima facie,
 
 the document is true. Imposition may have been practised on the Court, but it is not to be presumed. If the original be lost, unquestionably the recorded copy of it would be evidence. It would be an absurdity to suppose that the law had ordered that to be recorded, which bore not the stamp of truth, and had no claim to credit. If both the original and record be lost, the loss may be supplied by proof that they did exist. Whether the original be produced, or the record exhibited, or where neither remains, and the existence is shown of the original as a document acknowledged in Court, recognised as such by the act of the Court, and preserved as such among the public muniments in the proper repository, no more is then demanded to make out the affirmative of the issue, than evidence of identity.
 

 In this case, evidence, tending not only to establish the identity of the defendant’s intestate with the individual named as one of the obligors, but to establish the actual execution of the instrument by him, was given. And this was done where the defendant had not ventured to say that he disbelieved the fact of execution by his intestate, nor that he doubted of it, but only that he was not personally cognizant of the facts. The remaining inquiry on the trial of the issue, was as to the contents of the bond, and we are of opinion, that, for that purpose, the letter of the clerk, containing an abstract of the bond, was competent evidence. When the subject of investigation is the occurrence of certain supposed matters, in relation to which a witness professes to possess personal knowledge, he must testify fully to the best of his recollection. To bring back any forgotten circumstance, to restore a broken link of recollection, to refresh his memory, he may be allowed the aid of a former memorandum; but if, after this help, he obtains no remembrance of facts, distinct from the memorandum, he is not admitted to
 
 testify
 
 to them. If that which is offered to refresh his memory, be, itself, proper testimony, it is better than any statement he can make, founded solely upon it; and if it be not, as generally it is not, because not given under the solemn sanction of an oath, publicly in court, and with the securities for truth
 
 *424
 
 presented by a cross-examination, it does not become so by being then narrated by the witness. It is obvious, that court below, in rejecting the letter, acted upon this rule of evidence. But, to us it appears, that this rule does not apply where there is no question as to facts, originally entrusted to memory, and afterwards obliterated by time, but where the question simply is, as to the contents of a written paper, once existing, but since destroyed. Beyond doubt, a copy, verified in court by the oath of the copyist, to have been taken by himself from the original, would be more deserving of reliance, and therefore of higher dignity in the scale of evidence than his recollection of the contents. In either case, he pretends not to testify to facts, either as an eye or ear-witness of them, but to declare only what the document testified; to give, in the absence of the original, a faithful resemblance of it, and the copy, which was written with the original before him, is better than that which he is then to make out from memory. In the former, there is less danger of error. The impression is there made in durable and unchangeable characters, while in the latter it is faint and evanescent, and in a measui’e, at least, taken from the former. In both, our reliance for fidelity of resemblance must be placed upon the oath of him from whom each alike proceeds. If a full written copy be preferred to a
 
 professed
 
 full recollection, the same preference is due to an
 
 abstract
 
 or a copy in part, over a professed remembrance to the same extent. The former, so far as it goes, has the same superior advantages of durability and unchangeableness over frail memory, and is equally verified by the oath of the witness. It should be exhibited to him, not as an
 
 aid
 
 to his memory, for so far as it goes, it is more worthy of confidence than his memory, but for the purpose of being authenticated by him, as having been faithfully taken. If his memory extend beyond what is given in the abstract, then the former may be resorted to, not as more certain, but as more full, to supply the deficiencies of the latter. This order in the rank of evidence is distinctly recognised by Mr. Starkie, in speaking as to the proof of lost deeds. Stark. Ev. 341. “ After proof of the due execution of the
 
 *425
 
 original, the contents should be proved by means of a
 
 counterpart,
 
 if there be one, for this is the next best evidence, and it seems that no evidence of a mere copy is admissible, until proof has been given that the counterpart cannot be produced, although such counterpart was not stamped. If there be no counterpart, a
 
 copy
 
 may be proved in evidence by any witness who knows that it is a copy, from having compared it with the original. If there be no copy, the party may produce an
 
 abstract,
 
 or give in evidence a deed executed by the adversary, in which the instrument is recited, or
 
 even
 
 give parol evidence of the contents of a deed.”
 

 It is the opinion of this court that the decree of dismission be reversed, and the verdict of the jury set aside; and that the court below should order an
 
 tilias venire
 
 issue to try the matters of fact controverted in the cause, which it cannot satisfactorily ascertain without the aid of a jury.
 

 Per Curiam. Decree reversed and new trial ordered.